IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES A. BATES                                                    PLAINTIFF

V.                              CASE NO. 5:19-CV-5014

BENTONVILLE POLICE CHIEF JON SIMPSON;
DETECTIVES JERROD WISEMAN, ANDY
OLIVER, THOMAS BOYLE, KRIS MOFFIT, and
JOSHUA WOODHAMS; CAPTAIN JUSTIN
THOMPSON; THE CITY OF BENTONVILLE,
ARKANSAS; DR. CHARLES P. KOKES; and
KRISTINE COLLINS HOMAN                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Currently before the Court are:

- Defendant Kristine Collins Homan's Motion to Dismiss (Doc. 12) and Brief in Support (Doc. 13), and Plaintiff James A. Bates's Response in Opposition (Doc. 17);

- Defendant Dr. Charles P. Kokes's Motion to Dismiss (Doc. 19) and Brief in Support (Doc. 20), Mr. Bates's Response in Opposition (Doc. 33), and Dr. Kokes's Reply (Doc. 37); and

- The Motion to Dismiss (Doc. 25) and Brief in Support (Doc. 26) filed by Defendants Bentonville Police Chief Jon Simpson, Detective Jerrod Wiseman, Detective Andy Oliver, Detective Thomas Boyle, Detective Kris Moffit, Detective Joshua Woodhams, Captain Justin Thompson, and the City of Bentonville (collectively, "the Bentonville Defendants"), Mr. Bates's Response in Opposition (Doc. 34), the

1

Bentonville Defendants' Reply (Doc. 41), Mr. Bates's Sur-Reply (Doc. 42), and the Bentonville Defendants' Supplement (Doc. 45).

The Motions filed by Ms. Homan and Dr. Kokes are both **DENIED**. The Bentonville Defendants' Motion is **GRANTED** as to the only claim brought against the City of Bentonville in this case (Count X of Mr. Bates's Complaint), but that Motion is otherwise **DENIED**. The reasons for these rulings are given below.

## I. BACKGROUND

On November 21, 2015, Mr. Bates invited three friends named Sean Henry, Owen McDonald, and Victor Collins over to his house to drink alcohol, watch football, and use his hot tub. Eventually that evening Mr. Henry and then Mr. McDonald left and went home. Mr. Collins remained at Mr. Bates's house, and at some point that night, Mr. Collins died.

At 9:35 a.m. the next day, Mr. Bates called 911 to report that he had just found Mr. Collins dead in his hot tub. Police arrived at Mr. Bates's house soon after he placed the 911 call, and an investigation into the cause of Mr. Collins's death began. Three months later, Mr. Bates was arrested and charged in Benton County Circuit Court with murdering Mr. Collins. Circuit Judge Brad Karren presided over that criminal case, which ended roughly two years after Mr. Collins's death, when the prosecuting attorney moved on November 29, 2017 to dismiss the charges against Mr. Bates.

Nearly a year after the criminal charges against Mr. Bates were dismissed, Mr. Collins's widow, Kristine Collins Homan, filed a wrongful-death civil lawsuit against Mr. Bates in Benton County Circuit Court, on behalf of Mr. Collins's estate. That civil case was also assigned to Judge Karren. Mr. Bates was personally served with the complaint

2

in that case on November 6, 2018. Apparently Mr. Bates immediately reached out to the same Illinois lawyer who represented him in the criminal case, Kathleen Zellner, who sent Ms. Homan's attorney a four-page letter the very next day, on November 7, 2018. In that letter, Ms. Zellner stated that she represented Mr. Bates in the wrongful-death lawsuit, and that the complaint in that case was "frivolous and completely without merit." *See Kristine Collins Homan v. James Bates*, Benton County Circuit Court Case No. 04CV-18-3180 (hereinafter "Wrongful Death Lawsuit"), Exhibit A to Defendant's Reply filed on December 27, 2018 at 16:21:28, p. 1. Ms. Zellner threatened to file a counterclaim for malicious prosecution and a motion for sanctions under Ark. R. Civ. P. 11 if Ms. Homan would not dismiss the lawsuit with prejudice. *See id.*

Notwithstanding these threats, as of December 6, 2018, no responsive pleading had yet been filed on Mr. Bates's behalf in that case. Mr. Bates inquired of Ms. Zellner via text message on December 6, asking whether they needed to file a response that day. *See* Wrongful Death Lawsuit, Exhibit C to Defendant's Reply filed on December 27, 2018 at 16:21:28, p. 1. Ms. Zellner sent a reply text to Mr. Bates, saying "We are going to get an extension." *See id.* Three days earlier, Ms. Zellner had emailed Ms. Homan's attorney asking whether he would object to an anticipated motion for additional time to answer or otherwise plead. *See* Wrongful Death Lawsuit, Exhibit B to Defendant's Reply filed on December 27, 2018 at 16:21:28, p. 1. But apparently Ms. Collin's attorney was not agreeable to any such extension, and on December 10, there still being no responsive pleading or motion for extension on the docket, Ms. Homan moved for default judgment. Thirty-three minutes after that motion was filed, Judge Karren signed and filed an order granting it and entering default judgment. *See* Wrongful Death Lawsuit, Motion for Default

3

Judgment filed on December 10, 2018 at 15:29:30, *and* Default Judgment filed on December 10, 2018 at 16:02:41.

The next day, Mr. Bates filed a motion to set aside the default judgment, and a separate motion to extend time to respond to the complaint. This was but the first of several attempts Mr. Bates has made in that case to obtain such relief, and all of them have been denied. He has also filed a motion in that case asking Judge Karren to recuse, which likewise was recently denied. He is no longer being represented by Ms. Zellner in that case, but he has been represented by counsel throughout its pendency. As the default judgment was to liability only, the matter has been set for a jury trial on the issue of damages, currently scheduled to be held on November 6, 2019. *See* Wrongful Death Lawsuit, Scheduling Order filed on January 10, 2019 at 14:59:50.

On January 23, 2019, Mr. Bates initiated the instant lawsuit in *this* Court, filing a 59-page Complaint against Ms. Homan, the Bentonville Defendants, and Dr. Kokes (an employee of the Arkansas State Crime Laboratory who performed an autopsy on Mr. Collins). The Complaint alleges that the Defendants conspired to frame Mr. Bates for Mr. Collins's murder in order to help Ms. Homan obtain life insurance proceeds that would not be available to her if Mr. Collins were responsible for his own death. It alleges that the Bentonville Defendants were motivated to help Ms. Homan because Mr. Collins was a former police officer who worked with current Bentonville police officers in his job providing security for Walmart's corporate headquarters, he and Ms. Homan were neighbors to a Bentonville police officer, and he and Ms. Homan had several friends in the Bentonville police department.

4

According to the Complaint, Mr. Collins was 6'5" tall, weighed 315 pounds, had been in 103-degree water in the hot tub, and had a blood alcohol level of .318 along with Prozac and methylphenidate in his system at the time of his death. And although Dr. Kokes opined in his autopsy report that the cause of Mr. Collins's death was strangulation, Mr. Bates alleges that the autopsy was actually inconsistent with such a finding because, among other reasons, Mr. Collins's hyoid bone was not fractured, there were no ligature marks, scratches, or finger bruising on his neck, and there was no evidence of damage to his thyroid cartilage. He also alleges, among many other things, that Bentonville police officers concealed relevant audio recordings, destroyed his phone to prevent him from obtaining information from it, and falsified water meter readings, and that Ms. Homan wrote a letter to prosecutors falsely claiming that Mr. Bates was stalking her and her children in a vehicle that Mr. Bates was subsequently able to prove he no longer owned during the time period of the alleged stalking.

Mr. Bates's Complaint brings ten counts against these Defendants. Six counts are brought against the individual Bentonville Defendants and Dr. Kokes under 42 U.S.C. § 1983 for various constitutional violations, including false arrest, fabrication of evidence, reckless investigation, conspiracy to deprive constitutional rights, failure to intervene, and supervisory liability. The Complaint also brings three counts under Arkansas law against all individual Defendants (including Ms. Homan), for malicious prosecution, civil conspiracy, and outrage. The tenth count, for indemnification, is brought only against the City of Bentonville, alleging that an Arkansas statute requires the City to pay all judgments and settlements entered against the individual Bentonville Defendants for the other nine claims.

All of the Defendants have filed motions to dismiss the claims against them. For the most part, those motions are premised on either preclusionary or jurisdictional arguments in the vein that the ongoing Wrongful Death Lawsuit in Benton County Circuit Court is a bar either to Mr. Bates's claims in this case or to this Court's jurisdiction over them. Some of the Defendants also argue that the Complaint substantively fails to plead sufficient facts to support the claims brought against them under Arkansas law. All of these motions to dismiss are ripe for decision, as they have been fully briefed and the Court received oral argument on them at an April 9, 2019 case management hearing. The Court will discuss its rulings below, after reciting the legal standards governing motions to dismiss under Fed. R. Civ. P. 12(b)(1) and (6).

## II. LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must provide "a short and plain statement of the claim that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must accept all of a complaint's factual allegations as true, and construe them in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

However, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the

6

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* In other words, while "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.*

As for Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction, they "may be resolved either on the face of the pleadings or upon factual determinations made in consideration of matters outside of the pleadings." *Bhd. of Maint. of Way Emps. Div. of Intern. Bhd. of Teamsters v. Union Pac. R.R. Co.*, 475 F. Supp. 2d 819, 834-35 (N.D. Iowa 2007) (citing *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *Osborn v. United States*, 918 F.2d 724, 729 & n.6 (8th Cir. 1990)). Here, the Court will consider the same universe of materials for Rule 12(b)(1) purposes as for Rule 12(b)(6) purposes, which includes "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

### III. DISCUSSION

The Defendants' arguments in favor of dismissal can be grouped into four categories. The first category concerns whether Mr. Bates's claims are barred under the doctrine of *res judicata*. The second category concerns whether this Court should refrain

from exercising jurisdiction over Mr. Bates's claims in order to avoid interfering with or undermining the Wrongful Death Lawsuit. The third category concerns the doctrine of qualified immunity as applied to the individual Bentonville Defendants. And the fourth category concerns whether Mr. Bates's Complaint alleges sufficient facts to state a claim, independently of any jurisdictional concerns. This Opinion discusses each of these categories, in the aforementioned sequence,[1] below.

## A. *Res Judicata*

When the affirmative defense of *res judicata* is raised in a motion to dismiss under Rule 12(b)(6), the Court may dismiss a case on that basis if the doctrine's applicability "is apparent on the face of the complaint," including "public records and materials embraced by the complaint, and materials attached to the complaint." *See C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 763–64 (8th Cir. 2012) (internal citations, quotation marks, and alterations omitted). "The law of the forum that rendered the first judgment controls the res judicata analysis." *See id.* at 764 (quoting *Laase v. Cnty. of Isanti*, 638 F.3d 853, 856 (8th Cir. 2011)). Thus, this Court must apply the *res judicata* laws of Arkansas, which is the governing law in the Benton County Circuit Court, where the Wrongful Death Lawsuit is being adjudicated.

---

[1] Ordinarily, federal courts should resolve challenges to their subject-matter jurisdiction before reaching non-jurisdictional questions, so as to avoid opining on matters not properly before them. *See In re Athens/Alpha Gas Corp.*, 715 F.3d 230, 235 (8th Cir. 2013). However, when—as here—the jurisdictional challenge is based on the principle that a federal district court lacks authority to overturn a state court judgment, then it may be acceptable to engage in preclusionary analysis before engaging in jurisdictional analysis, because the two inquiries have a significant amount of overlap. *See id.* This Court believes that approach is appropriate here, for the sake of clarity and analytical ease.

Under Arkansas law, *res judicata* "consists of two facets, one being issue preclusion and the other claim preclusion." *Baptist Health v. Murphy*, 2010 Ark. 358, at *7. The first subsection below will take up the matter of claim preclusion. Then the next subsection will discuss issue preclusion.

### 1. Claim Preclusion

Claim preclusion "bars relitigation of a subsequent suit" when the following five elements are met:

(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies.

*See id.* at *8. "Res judicata bars not only the relitigation of claims that were actually litigated in the first suit, but also those that could have been litigated." *Id.* Thus, under Arkansas law "the failure to plead a compulsory counterclaim is res judicata as to that claim in a subsequent action between the parties." *See Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1431 (8th Cir. 1986) (citing *May v. Exxon*, 256 Ark. 865, 867–68 (1974)).

Here, the first element of claim preclusion is not satisfied. As has already been described in Section I above, the Wrongful Death Lawsuit is still very much ongoing. There is still a jury trial yet to be held on the issue of damages, and Mr. Bates's lawyers have stated that they intend to appeal the default judgment as to liability once the matter is ripe for appeal. "[W]hat constitutes a final judgment for *res judicata* purposes is not necessarily the same as what constitutes a final judgment for other purposes." *Griffin v. First Nat'l Bank of Crossett*, 318 Ark. 848, 853–54 (1994). But "[f]inality for purposes of appeal is closely related to finality for purposes of *res judicata*." *Crockett & Brown, P.A.*

v. *Wilson*, 314 Ark. 578, 582 (1993). And indeed, in the aforementioned case of *Griffin*, the Arkansas Supreme Court explained the existence of a final judgment on a counterclaim for *res judicata* purposes as follows: "The court entered judgment in favor of the Bank without making any reference to the counterclaim. This was tantamount to denial of the counterclaim, and, *when no cross-appeal was taken* in regard to the counterclaim, this had the effect of a final judgment denying it." *See* 318 Ark. at 853 (emphasis added). The obvious implication from the *Griffin* court's reasoning is that, at least in some cases, a judgment on the merits is not final for purposes of *res judicata* until the adversely affected party has had a full opportunity to appeal it.[2]

This is not to say that a party could wait until after a judgment on the merits has been appealed, but before the appeal has been resolved, to file a separate lawsuit bringing claims that were the subject of the first judgment on appeal. The Arkansas Supreme Court has held that *res judicata* bars such procedural maneuvers, because otherwise "a plaintiff could clog the courts and harass an adversary with suits on a claim already decided." *See Crockett & Brown*, 314 Ark. at 582. But that is not the situation

---

[2] The Defendants also argue that this Court should treat the default judgment in the Wrongful Death Lawsuit as if it were subject to interlocutory appeal, even though under well-settled Arkansas law, it plainly is not. *See Sevenprop Assocs. v. Harrison*, 295 Ark. 35, 36 (1988) ("We dismiss the appeal because the refusal to set aside a default judgment as to liability is not a final judgment as required for appeal. The issue of damages remains to be tried before there can be a final order." (internal citation omitted)). They point to Ark. R. App. P. Civ. 2(a)(4), which permits a direct appeal from "[a]n order which strikes out an answer, or any part of an answer, or any pleading in an action," and they argue that a trial court's refusal to set aside a default judgment or extend time to answer "effectively" strikes a belated answer, *see* Doc. 13, p. 6. But Judge Karren explicitly denied Ms. Homan's motion to strike Mr. Bates's untimely answer in the Wrongful Death Lawsuit, *see* Wrongful Death Lawsuit, Order Denying Motion to Strike filed on January 25, 2019 at 15:14:07, and the Arkansas Court of Appeals has squarely rejected the notion that a default judgment can "implicitly" strike an answer for purposes of Ark. R. App. P. Civ. 2(a)(4), *see JPMorgan Chase Bank, N.A. v. Scott*, 2017 Ark. App. 358, at *2.

here. The Wrongful Death Lawsuit was barely out of the starting gate when the instant lawsuit was filed, and it is still nowhere near the date of its jury trial, much less ripe for appeal. "It is well settled that federal district courts and state courts are separate jurisdictions, and *identical* cases between the same parties can proceed simultaneously. In such a situation, [the Arkansas Supreme Court] has held that the first forum to *dispose* of the case enters a judgment that is binding on the parties." *Baptist Health*, 2010 Ark. at *8 (emphasis added).

To be clear, this Court is not saying that a default judgment can *never* be final for *res judicata* purposes. Arkansas law is crystal-clear that it can be. *See Williams v. Conn. Gen. Life Ins. Co.*, 26 Ark. App. 59, 61 (1988). The problem here for purposes of finality is not the means by which this default judgment was obtained, but rather the fact that its status is not yet finished being litigated in the first place. At some point in time much later from now, either the Wrongful Death Lawsuit or the instant lawsuit will arrive at a final judgment on the merits for purposes of claim preclusion before the other does. That event may well have a significant impact on the other lawsuit. But that day has not yet arrived.

## 2. Issue Preclusion

As noted above, claim preclusion is not the only facet of *res judicata* in Arkansas; there is also the doctrine of issue preclusion, also known as "collateral estoppel." *See Hardy v. Hardy*, 2011 Ark. 82, at *5–*6. Issue preclusion has four elements under Arkansas law:

> (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment.

*See id.* at *6. Here, the Defendants contend that Mr. Bates must be collaterally estopped "from challenging the factual issue that he intentionally killed Victor Collins," because the complaint on which Mr. Bates defaulted in the Wrongful Death Lawsuit alleges, *inter alia*, that Mr. Bates and Mr. Collins "began to fight, which ultimately ended with Victor's death," and that Mr. Bates "willfully inflict[ed] enough physical force upon Victor to cause his death." *See* Doc. 13, p. 8; Wrongful Death Lawsuit, Complaint filed on November 2, 2018 at 14:40:21, ¶¶ 11, 14. Mr. Bates vehemently denies that there was any altercation between him and Mr. Collins.

The Defendants point to the Restatement (Second) of Judgments, § 13, as well as the cases of *John Morrell & Company v. Local Union 304A of United Food and Commercial Workers, AFL-CIO*, 913 F.2d 544, 563 (8th Cir. 1990), and *Zdanok v. Glidden Company, Durkee Famous Foods Division*, 327 F.2d 944, 955 (2d Cir. 1964), for the proposition that less "finality" is required for purposes of issue preclusion than for claim preclusion—and more specifically, that an initial determination of liability in bifurcated proceedings can be "final" for purposes of issue preclusion even when it is not yet an appealable order because damages have yet to be adjudicated. This Court does not entirely disagree with this characterization of those authorities, but it does ultimately disagree with how far the Defendants carry them.

The first, and perhaps most important, observation to make here is that none of these authorities is interpreting *Arkansas* law on issue preclusion—which, as noted above, is what this Court must apply. Neither the Defendants, nor Mr. Bates, nor this Court has found any Arkansas cases holding that less "finality" is required for issue preclusion than for claim preclusion.

A second important observation is that none of the authorities cited by the Defendants for this proposition articulates a bright line or straightforward rule of decision. Rather, the general principle is that a ruling prior to final judgment *may* be final for purposes of issue preclusion, but that in any given case this will depend on the fuzzy question of whether "the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again," *see John Morrell & Co.*, 913 F.2d at 563 (quoting *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961)); *Zdanok*, 327 F.2d at 955 (same), or on whether the ruling prior to final judgment was "necessarily based upon a determination that constitutes an insuperable obstacle to the plaintiff's success on the merits," *see John Morrell & Co.*, 913 F.2d at 563–64 (quoting *Miller Brewing Co. v. Jos. Schlitz Co.*, 605 F.2d 990, 995 (7th Cir. 1979)). The comment to the Restatement provides a hypothetical illustration of a jury making a determination of liability at trial in a jurisdiction with bifurcated proceedings for damages, and observes that "prior to the second phase, the jury's verdict as to liability *may* be held conclusive as to the issues of . . . negligence in any other action . . . in which the same issues appear." *See* Restatement (Second) of Judgments, § 13, cmt. g, ill. 3 (emphasis added). But this illustration occurs after an extended discussion, in the same comment, of how relaxing the requirement of "finality" for purposes of issue preclusion can be appropriate if applying the ordinary, more demanding, requirement of finality would "involve hardship" such as "needless duplication of effort and expense in the second action to decide the same issue." *See id.* Where a preliminary judgment of liability is obtained by default, rather than by jury trial, concerns about "needless duplication of effort and expense in the second action to decide the same issue" are virtually nonexistent.

Here it should be emphasized, as in the preceding subsection of the instant Opinion, that this is *not* to say that a default judgment can *never* be final for purposes of preclusion. Again, such a holding would be flatly inconsistent with Arkansas law. *See Williams*, 26 Ark. App. at 61. In any case involving default judgment, if that default judgment is permitted to stand then there must, at some point, come a time when the default judgment acquires issue-preclusive effect; it is just a question of *when*.

This Court believes that, if squarely confronted with the question, the Arkansas Supreme Court would hold that on the facts of the instant case, the default judgment will not acquire issue-preclusive effect until the party against whom it was entered has received the benefit of a full and fair opportunity to appeal it. The aforementioned concerns about duplicative efforts are not present here; indeed, unless the default judgment is set aside, Mr. Bates presumably will be prohibited from putting on evidence to contradict it at the trial on damages in the Wrongful Death Lawsuit. *See, e.g., B & F Eng'g, Inc. v. Cotroneo*, 309 Ark. 175, 181 (1992). Mr. Bates has already promptly and vigorously contested the default judgment in the same lawsuit where it was entered, and has given every indication that he intends to appeal the matter once it is ripe for appeal. Given the near-inevitability that the propriety and validity of the default judgment will eventually be the subject of a fiercely-fought appeal, this Court does not believe it can be said at this time that "the litigation of" whether Mr. Bates intentionally killed Mr. Collins— or for that matter even killed him at all—"has reached such a stage that" there is "no really good reason for permitting it to be litigated again." *See John Morrell & Co.*, 913 F.2d at 563. Indeed, the issue has hardly been litigated at all. This seems especially appropriate in light of the Arkansas Supreme Court's general observation that "res judicata bars a

subsequent lawsuit that raises *issues* resolved in a *final judgment from which an appeal was not taken* in a previous lawsuit." *Hardy*, 2011 Ark. 82, at \*7 (emphasis added).[3] Accordingly, this Court concludes that Mr. Bates's claims in the instant lawsuit are not presently barred by the doctrine of *res judicata*.[4]

### B. Jurisdiction

In addition to their arguments about *res judicata*, the Defendants contend that this Court either lacks subject-matter jurisdiction over this lawsuit, or that it should abstain from exercising its subject-matter jurisdiction here. The former argument concerns a doctrine known as "the *Rooker-Feldman* doctrine." The latter argument concerns a type of abstention known as "*Younger* abstention." Both of these arguments are premised, in different ways, on the notion that permitting the instant lawsuit to proceed would impermissibly conflict or interfere with the Wrongful Death Lawsuit in the Benton County Circuit Court. Below, the Court will first address the *Rooker-Feldman* doctrine's applicability. Then it will take up the matter of *Younger* abstention.

#### 1. The *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine takes its name from a couple of seminal United States Supreme Court cases: *Rooker v. Fidelity Trust Company*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). "The *Rooker-*

---

[3] Unfortunately this quote, while persuasive, does not definitively resolve the matter, because it is unclear from the context surrounding it whether the Arkansas Supreme Court is referring only to the claim-preclusion aspect of *res judicata*, or to both the claim-preclusion and issue-preclusion aspects of *res judicata*.

[4] Because the Court finds that the default judgment in the Wrongful Death Lawsuit is not presently final for purposes of *res judicata*, it does not reach the issue of whether any other elements of claim preclusion or issue preclusion are satisfied here.

*Feldman* doctrine recognizes that, with the exception of habeas corpus petitions, lower federal courts lack subject matter jurisdiction over challenges to state court judgments. The doctrine precludes district courts from obtaining jurisdiction both over the rare case styled as a direct appeal, as well as more common claims which are 'inextricably intertwined' with state court decisions." *King v. City of Crestwood, Mo.*, 899 F.3d 643, 647 (8th Cir. 2018) (quoting *Simes v. Huckabee*, 354 F.3d 823, 827 (8th Cir. 2004)) (internal citations and quotation marks omitted). It "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

Importantly, "[w]hen there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court," because the United States Supreme Court "has repeatedly held that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *See id.* at 292 (internal quotation marks omitted). "Nor does [the *Rooker-Feldman* doctrine] stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* at 293. Rather, as has already been discussed in the previous subsections of this Opinion, "[i]f a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* (internal quotation marks and alterations omitted).

In some of Mr. Bates's briefing on the matter of preclusion, he has occasionally invited this Court to make rulings that might be inconsistent with the principles underlying the *Rooker-Feldman* doctrine—for example, by arguing that the default judgment entered in the Wrongful Death Lawsuit is "void" for various reasons. *See* Doc. 17, pp. 6–15. But the Court has not accepted those invitations, and does not intend to do so in this lawsuit. If Judge Karren continues to let the default judgment stand in the Wrongful Death Lawsuit, then it will eventually be the task of the Arkansas Court of Appeals, the Arkansas Supreme Court, or perhaps ultimately even the United States Supreme Court, to determine whether the default judgment is void, or should be set aside, vacated, or reversed for any reason. But as should be obvious by now from the analysis in the preceding subsections of this Opinion, it is not necessary for this Court to permit any collateral attack on the default judgment in order to engage in legitimate preclusion analysis.

Mr. Bates's claims in this case are not "inextricably intertwined" with Ms. Homan's claims against him in the Wrongful Death Lawsuit. Even if a final judgment is ultimately entered against Mr. Bates in the Wrongful Death Lawsuit, it would be an adjudication of what Mr. Bates knew and did on November 21, 2015—not of what Ms. Homan, Dr. Kokes, and the Bentonville Defendants knew and did for the next two years following that night during the criminal investigation and prosecution regarding those events. It is conceivable, for example, that Mr. Bates was in fact responsible for Mr. Collins's death in a manner satisfying the conditions for civil liability but not satisfying the elements of murder, that the information available to these Defendants during the investigation and prosecution of this matter was insufficient to support probable cause that Mr. Bates murdered Mr. Collins—and that accordingly they fabricated inculpatory evidence and

destroyed or concealed mitigating or exculpatory evidence in order to bolster their chances of obtaining their desired outcomes. And of course, as has already been discussed above in the subsection on *res judicata*, if the default judgment ultimately obtains preclusive effect before the resolution of the instant case, then that preclusive effect will be applied in this case to whatever extent it exists.[5]

## 2. *Younger* Abstention

For similar reasons, *Younger* abstention is not appropriate here. *Younger* abstention takes its name from the United States Supreme Court case of *Younger v. Harris*, 401 U.S. 37 (1971). The *Younger* doctrine exists to prevent improper federal judicial interference with certain types of state proceedings. The *Younger* cases recognize three—and only three—"exceptional circumstances" in which a federal court with proper jurisdiction over a lawsuit should nevertheless abstain from exercising that jurisdiction: (1) when the exercise of its jurisdiction would constitute "federal intrusion into ongoing state criminal prosecutions"; (2) when the exercise of its jurisdiction would intrude into a "civil enforcement proceeding" that is "akin to a criminal prosecution," typically one initiated by a state actor; or (3) when the exercise of its jurisdiction would interfere with pending "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78–80 (2013).

---

[5] As previously noted, the Court did not need to reach the question in this Opinion of whether any other elements of *res judicata* were unmet. If a final judgment for purposes of preclusion is obtained in the Wrongful Death Lawsuit before the instant case is resolved, then it will be necessary to consider, for example, whether any issues or claims in the instant case are the same as those involved in the Wrongful Death Lawsuit. *See* Section III.A, *supra*.

Importantly, and in keeping with a theme that should be very familiar to the reader by now, *Younger* abstention is *not* triggered merely by the existence of parallel state-court proceedings. *See id.* As the Supreme Court observed in *Sprint Communications*:

> Federal courts, it was early and famously said, have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821). Jurisdiction existing, this Court has cautioned, a federal court's "obligation" to hear and decide a case is "virtually unflagging." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Parallel state-court proceedings do not detract from that obligation.

*Id.*

The Wrongful Death Lawsuit obviously is not a criminal prosecution or a civil proceeding initiated by a state actor that is akin to a criminal prosecution. The Defendants do not appear to contend otherwise. Instead, they argue that the Wrongful Death Lawsuit is a "civil proceeding[] involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." The only authority they cite in support of this argument is the 1997 Eleventh Circuit case of *Old Republic Union Insurance Company v. Tillis Trucking Company, Incorporated*, 124 F.3d 1258. That case also involved a state-court wrongful death action, but that is about where the similarities between it and the instant matter end.

In *Old Republic*, the relevant state court proceeding was one in which an Alabama jury returned a multi-million dollar verdict against a trucking company for a wrongful death arising from a traffic accident. *See* 124 F.3d at 1259–60. Three days after the jury returned that verdict, the trucking company's insurer filed a lawsuit in federal court, seeking a declaratory judgment that Alabama's wrongful death statute was unconstitutional, that it could not be constitutionally enforced against the insurer, and that

the insurer's liability to the trucking company could not exceed its $1,000,000 policy limit. *See id.* at 1260. The Eleventh Circuit affirmed the district court's dismissal of the federal lawsuit under *Younger* abstention on the grounds that "a declaration that the Alabama Wrongful Death Statute is unconstitutional would have the effect of enjoining the state court from enforcing the $7,000,000 wrongful death judgment entered against" the trucking company. *See id.* at 1261.

Here, as already explained above, there need not be any inconsistency between the eventual judgment in this case and the eventual judgment in the Wrongful Death Lawsuit. This Court certainly is not being asked to declare Arkansas's wrongful death statute unconstitutional. And, again, to the extent that this Court might be asked along the way to invalidate, overturn, limit, or otherwise collaterally attack the default judgment in the Wrongful Death Lawsuit, it will simply refuse to deviate from the principles of *res judicata* established under Arkansas law. Although there is subject-matter overlap between the instant lawsuit and the Wrongful Death Lawsuit, this Court does not see any "exceptional circumstances," *Colo. River Water Conservation Dist.*, 424 U.S. at 813, much less "the clearest of justifications," *see id.*, that would "justify the surrender of jurisdiction," *Fru-Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 540 (8th Cir. 2009) (quoting *Mountain Pure, LLC v. Turner Holdings, LLC*, 439 F.3d 920, 926 (8th Cir. 2006)) (internal alterations omitted), under any theory of abstention, whether *Younger* or otherwise. In short, this Court has proper jurisdiction of this lawsuit, and it will not shirk its obligation to exercise that jurisdiction, because allowing this case to proceed will not impermissibly interfere with the Wrongful Death Lawsuit.

## C. Qualified Immunity

Next, the individual Bentonville Defendants assert that if this Court finds "that the factual issues determined by the default judgment in the Wrongful Death [Lawsuit] are preclusive in this matter," then they "are entitled to qualified immunity for all federal constitutional claims and state law tort claims." *See* Doc. 26, p. 11. Given that the Court has already ruled above that the default judgment does *not* presently have preclusive effect, then that could perhaps be the end of the matter so far as this particular argument goes. But the Court would make several more observations on this topic before moving on.

The Court is skeptical that the aforementioned argument can accurately be characterized as one for qualified immunity. Rather, it seems to the Court that this argument is simply a reassertion of the separate defense of *res judicata* and calling it by another name. Under the federal doctrine of qualified immunity, a government official who is sued in his individual capacity for violating someone's federal constitutional rights is immune from claims for damages arising from the alleged violation unless both of the following prongs are satisfied: (1) "the facts that a plaintiff has alleged . . . make out a violation of a constitutional right"; and (2) "the right at issue was clearly established at the time of the defendant's alleged misconduct." *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). But the individual Bentonville Defendants never contend anywhere in their briefs that, for example, it is not a violation of a clearly established constitutional right to fabricate and destroy evidence in a criminal investigation in order to frame someone for murder. Nor, in line with the same example, do they argue that Mr. Bates's Complaint fails to allege that they did those things. Instead,

they simply argue that they are entitled to "qualified immunity" because the facts alleged in the Wrongful Death Lawsuit's complaint are inconsistent with the claims in Mr. Bates's Complaint.

Similarly, the individual Bentonville Defendants cite Ark. Code Ann. § 21-9-301(a) for the proposition that they are also entitled to statutory and qualified immunity under Arkansas law from the state-law claims brought against them. *See* Doc. 26, p. 12. It is very well-settled under Arkansas law that this statute does not provide immunity from liability for intentional torts. *See, e.g.*, *City of Farmington v. Smith*, 366 Ark. 473, 478 (2006); *Battle v. Harris*, 298 Ark. 241, 245 (1989). All three state-law claims brought against the individual Bentonville Defendants are intentional torts. *See Chambers v. Stern*, 347 Ark. 395, 404 (2002) (civil conspiracy); *Kellerman v. Zeno*, 64 Ark. App. 79, 89 (1998) (malicious prosecution); *Deitsch v. Tillery*, 309 Ark. 401, 407 (1992) (outrage). But as with the federal claims, the individual Bentonville Defendants never actually argue that Mr. Bates's Complaint fails to allege that they committed intentional torts; rather, they simply substitute the allegations in the Wrongful Death Lawsuit's complaint for the allegations in Mr. Bates's Complaint, on the grounds that the default judgment has preclusive effect. Again, it seems to the Court that they are merely re-arguing *res judicata* and calling it "qualified immunity." For all the foregoing reasons, then, the Court rejects the individual Bentonville Defendants' contention that they are entitled to qualified immunity at this time.

## D. Factual Sufficiency of the Complaint

The fourth and final category of arguments raised in the Defendants' motions to dismiss concerns the sufficiency of the factual basis for Mr. Bates's claims as pleaded in

his Complaint. In other words, this category concerns the sort of argument that one more typically sees in a motion to dismiss under Rule 12(b)(6): that the Complaint simply fails to state a claim upon which relief can be granted. As discussed in Section II above, for purposes of this analysis the Court must accept all of the Complaint's allegations as true, and draw all reasonable inferences therefrom in Mr. Bates's favor.

The City of Bentonville makes one such argument. Mr. Bates has brought only one count against the City—Count X—alleging that Ark. Code Ann. § 21-9-304 requires the City to pay all judgments and settlements entered against the individual Bentonville Defendants for the other nine claims. The City argues that Mr. Bates has misread this statute, and that it only requires the State of Arkansas to indemnify a local government whose employees are under the supervision of the State or of a State employee. *See* Doc. 26, p. 12. In his Response to the City's Motion, after giving the matter further review, Mr. Bates concedes that Ark. Code Ann. § 21-9-304 does not apply here, and that he does not oppose dismissal of Count X. *See* Doc. 34, p. 18. Therefore, Count X will be dismissed with prejudice.

The remaining traditional Rule 12(b)(6) arguments are all made by Ms. Homan. She contends that the Complaint fails to allege sufficient facts to support the state-law claims brought against her. The Complaint brings three such claims: civil conspiracy, malicious prosecution, and the tort of outrage.

The Arkansas Supreme Court describes the elements of civil conspiracy as follows:

> In order to prove a civil conspiracy, one must show a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another. Such a

conspiracy is not actionable in and of itself, but recovery may be had for damages caused by acts committed pursuant to the conspiracy. Civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong.

*Chambers*, 347 Ark. at 404 (quoting *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 445 (2001))

(internal citations and alterations omitted).

As for malicious prosecution, the Arkansas Supreme Court has listed the following

five elements:

(1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages.

*McMullen v. McHughes Law Firm*, 2015 Ark. 15, at *15. The tort of malicious prosecution

qualifies as an unlawful or oppressive purpose of a civil conspiracy. *Cf. Ramsey v.*

*Flowers*, 72 Ark. 316 (1904) (evidence of co-conspirators' actions in furtherance of

conspiracy is admissible in suit for malicious prosecution). And even if one would not

otherwise "be liable as a direct actor" for the tort that serves as the object of a civil

conspiracy, she may incur accomplice liability "as a participant in a conspiracy which

results in one or more overt acts by others constituting" an actionable tort. *See Mason v.*

*Funderburk*, 247 Ark. 521, 529 (1969).

Ms. Homan offers two arguments as to why Mr. Bates's Complaint fails to state a

claim against her for malicious prosecution. The first argument is that the preclusive

effect of the Wrongful Death Lawsuit's default judgment provides her a defense to this

tort because "[p]roof of the plaintiff's actual guilt of the offense charged is a complete

defense to an action to recover damages for a malicious prosecution for the offense."

*Whipple v. Gorsuch*, 82 Ark. 252 (1907). The Court rejects this argument for the same

reasons it has ruled above that the default judgment presently has no preclusive effect.[6]
The other argument is that the Complaint never alleges that *she* personally initiated the
criminal proceeding against Mr. Bates by making a false statement to the prosecutors.
But this argument overlooks that, as already noted, if the Complaint pleads sufficient facts
to show that she was a participant in the conspiracy to maliciously prosecute Mr. Bates,
then her coconspirators' satisfaction of this element would also satisfy it as to her.

The Complaint pleads sufficient facts to show that Ms. Homan participated in a
civil conspiracy to commit malicious prosecution. It alleges that the individual Bentonville
Defendants audio recorded a conversation with Ms. Homan in which she and they agreed
to blame Mr. Bates for causing Mr. Collins's death in order to facilitate her recovery of his
life insurance benefits, and that the individual Bentonville Defendants concealed the audio
recording of this conversation from Mr. Bates. *See* Doc. 1, ¶¶ 117–19, 123. It alleges
that she falsely told prosecutors that Mr. Bates was stalking her. *See id.* at ¶ 121. It
alleges that she lied to Owen McDonald's wife about whether Mr. Bates was cooperating
with police, and further encouraged Mr. McDonald's wife to lie about what time he arrived
home from Mr. Bates's house. *See id.* at ¶¶ 216–17. And of course the Complaint is
replete with many allegations about other actions that the other members of the alleged
conspiracy took in furtherance of its object of malicious prosecution. Thus, the Complaint
alleges sufficient facts to state a claim of malicious prosecution against Ms. Homan, by
virtue of her alleged participation in a conspiracy to that end.

Finally, as for the tort of outrage, it has four elements:

---

[6] This is not to say that Ms. Homan cannot prove this defense at a later stage of this case
with evidence that she acquires through discovery. But at the present stage, this Court
is bound to accept the allegations in Mr. Bates's Complaint as true.

> (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Rees v. Smith*, 2009 Ark. 169, at *5. Ms. Homan argues that Mr. Bates "has not alleged any kind of emotional distress cognizable under the claim," and "has failed to allege any actual outrageous conduct." *See* Doc. 13, p. 15. The Court disagrees. This Court is of course aware that Arkansas law imposes a very demanding standard on claims of outrage, that this tort "is not easily established," and that it "does not make actionable every insult or indignity one must endure in life." *See Family Dollar Trucking, Inc. v. Huff*, 2015 Ark. App. 574, at *9. But in the absence of any Arkansas cases holding to the contrary, this Court believes alleging that someone carried out a conspiracy to frame an innocent man for murder, leading to actual murder charges being brought against that person, amply clears the bar for purposes of a Rule 12(b)(6) motion.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Kristine Collins Homan's Motion to Dismiss (Doc. 12) and Defendant Dr. Charles P. Kokes's Motion to Dismiss (Doc. 19) are both **DENIED**.

**IT IS FURTHER ORDERED** that the Bentonville Defendants' Motion to Dismiss (Doc. 25) is **GRANTED** as to Count X of Plaintiff James A. Bates's Complaint (Doc. 1), and **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Count X of the Complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this _15th_ day of April, 2019.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE